UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

WANDA G. LEDBETTER,                )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )   Civil Action No. CV-95-S-3230-NE
                                   )
HUNTSVILLE CITY SCHOOL             )
SYSTEM,                            )
                                   )
        Defendant.                 )

**ENTERED**

## MEMORANDUM OPINION

**DEC 1 8 1997**

Wanda Gail Ledbetter formerly was employed by the Huntsville

City School System as a "Child Nutrition Program worker." She was

one of those persons who prepared food for service to students in

the Challenger Elementary & Middle School cafeteria. She began her

employment on August 24, 1989, at the beginning of the 1989-90

school year. She remained so employed until a few months into the

1994-95 school year when, on November 7, 1994, she resigned for

reasons that prompted this suit. The action now is before the

court for entry of judgment following a bench trial. Upon

consideration of the pleadings, stipulations, testimony, exhibits,

arguments and briefs of counsel, this court makes findings of fact

and enters conclusions of law.

### I. BACKGROUND FACTS

The Challenger cafeteria staff consisted of salad bar workers,

meat cooks, vegetable cooks, bread and pastry cooks, cashiers, a

clean-up person, an assistant manager, and a manager. From the

beginning of Mrs. Ledbetter's employment until October 1992 (*i.e.,*

about two months into the 1992-93 school year), Ms. Shirley Ann Gore was manager of the cafeteria.  Laura Jane Holman assumed those duties when Ms. Gore resigned for undisclosed reasons of personal health.

The evidence concerning the duties performed by plaintiff prior to the 1992-93 school year is not altogether satisfactory. Mrs. Ledbetter said she had been a vegetable cook.  Other witnesses described different duties, such as preparing fruit cups for service to students during the lunch period, and, performing various clean-up duties in and around the cafeteria. Ms. Gore, for example, said plaintiff "never was a vegetable person; she was a floater," working at whatever tasks Ms. Gore assigned to her. Objective evidence supports the contention that all cafeteria employees (with the possible exception of "meat cooks") were expected to perform a number of tasks, unrelated to the preparation of any specific food groups.[1]  For example, the following is defendant's job description for "Child Nutrition Program Worker[s]"[2]:

| | |
|---|---|
| TITLE: | Child Nutrition Program Worker |
| QUALIFICATIONS: | Completion of the ninth grade, and/or one (1) year of experience in food preparation. |
| REPORTS TO: | Child Nutrition Program Manager |
| JOB GOALS: | To assist in the maintenance of an efficient and sanitary child nutrition program and to assist in food preparation. |

---

[1] The most sensible account of the responsibilities of Child Nutrition Program workers was provided by Janet Waller, who worked in the Challenger lunchroom from 1993 until the end of the 1994-95 school year.  She testified that "meat people primarily stayed in meats, but the other people floated around."

[2] Plaintiff's Exhibit No. 5.

2

PERFORMANCE RESPONSIBILITIES:

1.  Assists in the preparation and service of food.

2.  Serves students and staff.

3.  Assists in the cleaning of kitchen, tables and furnishings in the dining area.

4.  Maintains the kitchen area in a neat and sanitary fashion.

5.  Performs related duties as required, including duties at special meal functions.

6.  Performs other duties as required.

TERMS OF EMPLOYMENT:    Nine month year.  Salary as recommended by the Superintendent and approved by the Board.

The court nevertheless is reasonably satisfied that, from her hire date until the Fall of 1992, plaintiff worked at least in part as a vegetable cook.

The duties of a vegetable cook usually were completed in the morning, before service of the first lunch shift.  The person responsible for preparing vegetables on any given day, therefore, performed other tasks while lunch was served, and during the afternoon.  Afternoon chores were assigned by the manager on a daily or weekly basis, and posted on a bulletin board in the kitchen.  One of those rotating assignments was that of "wiping down the cooler," which required moving (or removing) food items stacked on wire racks in order to disinfect the shelves with a bleach water solution.

Mrs. Ledbetter's position changed during the 1992-93 school year.  She was assigned the duties formerly performed by Cheryl Hill, who had resigned.  Those duties involved:  preparing the teachers' table for the mid-morning break; cleaning tables in the

**3**

student dining area; cleaning and stocking staff bathrooms; and removing trash. The evidence regarding the date of the change in plaintiff's duties, the reasons for it, and the person making the decision is muddled. Shirley Ann Gore testified that she — not her successor, Jane Holman — moved plaintiff into Cheryl Hill's position.[3]  Mrs. Gore explained the transfer in a manner that suggested sympathy for plaintiff's health problems, saying that her new duties did not have to be performed on a daily basis, and, could be conducted at a more leisurely pace. While all of that may be so, this court concludes that Ms. Gore moved Mrs. Ledbetter to the clean-up position for punitive reasons: Mrs. Gore had become dissatisfied with the pace and quality of plaintiff's work.[4]

Indeed. In Mrs. Gore's impression of sloth — an opinion that came to be shared by her successor, Jane Holman — lies one of the difficulties of this case. Several co-employees confirmed that plaintiff was not the best worker on staff, either before or after the surgical procedure discussed hereafter. For example, Dawn Massey Kirby, a cashier, testified that Mrs. Ledbetter was "off a lot," and did not stay on task, because she "talked a lot." Sheila Jean Hooks, who worked as a bread and pastry cook from December of 1989 until May of 1993,[5] observed that plaintiff was absent from work "more" than other employees — "it usually was on a Monday"[6]

---

[3] For reasons that are discussed on page 6 *infra*, this court determines that Shirley Ann Gore, not Jane Holman, changed plaintiff's job duties prior to plaintiff's surgery discussed hereafter.

[4] See the discussion of the last employee evaluation performed by Shirley Ann Gore at the end of the 1991-91 school year in note 8 (3d ¶) *infra*.

[5] Mrs. Hooks now is manager of the Hampton Cove Elementary School lunchroom.

[6] On cross-examination, Mrs. Hooks confessed that she could be mistaken

4

— and that she was "slow" in the performance of tasks. She remembered that plaintiff often was reprimanded for talking to other workers, thereby diverting attention from their own duties. Janet Waller, who worked at Challenger during the 1993-94 and 1994-95 school years,[7] observed that plaintiff "was slower" than other employees: she seemed to take about twice as long as anyone else to complete an assignment. Ms. Waller added that, on several occasions, she urged plaintiff to become "a team player": to work faster, help others, "so we all can get out of here sooner."[8]

Ms. Ledbetter missed several days of work due to illness at the beginning of the 1992-93 school year. On September 8, 1992, she presented lunchroom manager Shirley Gore a "Return to Work" slip signed by her physician, Dr. Edwin Rice. The note advised

---

about the pattern of plaintiff's absences, but emphasized that "[i]t seemed [she was out] a lot. I wouldn't say it all was on Mondays."

[7] Ms. Waller now is manager of the Stone Middle School lunchroom.

[8] This anecdotal evidence is neither totally consistent with, nor is it negated by, plaintiff's personnel records, which suggest that she generally was considered a "satisfactory" employee. Lunchroom managers annually rated each employee's job performance in twelve categories on a five point scale roughly corresponding to the "A-B-C-D-F" grading system familiar to all public school students. The categories were: quality of work; quantity of work; interest; attendance & punctuality; responsibility & dependability; use of time; cooperation; initiative; personal qualities; public relations; acceptance of constructive criticism; and, knowledge of position. The rating scale was: superior; very good; satisfactory; unsatisfactory; and undesirable.

The evaluation performed by Shirley Gore at the end of plaintiff's first year of employment (the 1989-90 school year) rated her as "very good" in all categories except "initiative" and "knowledge of position," in which she received a rating of "satisfactory." Plaintiff's evaluation at the end of her second (the 1990-91) year reflects "superior" ratings in four categories, "very good" in four, and "satisfactory" in all others.

The 1991-92 evaluation, however, the last performed by Shirley Gore, reveals an overall decline: plaintiff was rated "very good" in only three categories and "satisfactory" in all others.

The first evaluation performed by Laura Jane Holman occurred at the end of the 1992-93 school year. It was substantially similar to the last evaluation authored by Shirley Gore, with one exception: Holman rated plaintiff's "attendance & punctuality" as "unsatisfactory." It is not clear whether that rating reflects the fact that plaintiff was off work for more than one month as a result of the medical condition discussed hereafter, or mirrors the anecdotal observations of co-workers discussed above. It nevertheless is the only "unsatisfactory" blemish on plaintiff's five year record.

5

that plaintiff "should not lift anything over 20 pounds or anything over her shoulders due to her [impending] surgery on 9/15/92." (Plaintiff's Exhibit 3.) On the date scheduled, plaintiff braved surgical repair of a "dropped bladder": a complication of a hysterectomy performed eight years before.[9]

Dr. Rice released plaintiff to return to work on October 27, 1992, but with restrictions: "Due to previous surgery, she may have light duties lifting 20 pounds <u>and I would suggest for her to be transferred to another area</u>." (Plaintiff's Exhibit 3 at 2 (emphasis supplied).)

The court pauses to focus upon the emphasized portion of Dr. Rice's note, because it impacts plaintiff's credibility. Mrs. Ledbetter testified she had been a vegetable cook prior to surgery, and that Jane Holman transferred her to Cheryl Hill's clean-up position when she returned, in total disregard of her physician's lifting restriction. Shirley Ann Gore denied that, insisting <u>she</u> had imposed the cleaning duties on plaintiff <u>before</u> surgery. This court finds Ms. Gore's testimony to be the more credible account: otherwise, Dr. Rice would not have suggested that plaintiff "be transferred to another area," such as the vegetable cook position she continues to favor.

Mrs. Ledbetter's first day back at work following surgery was October 28, 1992. By that date, Shirley Gore had resigned and Jane Holman had assumed the position of manager. She did not transfer

---

[9] The parties' stipulation recites that plaintiff's hysterectomy occurred on January 1, 19<u>95</u>. Clearly this is an error. Plaintiff's medical records indicate the correct date is January 1, 19<u>85</u>.

6

plaintiff "to another area" as requested by Dr. Rice.  Instead, she required her to wipe tables and remove plastic bags containing food scraps from five, 60-gallon garbage canisters located in the student dining area.

On various occasions between plaintiff's return to work on October 28, 1992, and her resignation on November 7, 1994, Mrs. Ledbetter complained to Jane Holman, John Calvarese (principal of Challenger Middle School), Carol Wheelock (Child Nutrition Program Coordinator), Paul Kelly (Wheelock's supervisor), representatives of the Huntsville Education Association, and others that her job duties required lifting weights exceeding her medical restriction. She consistently asked to be transferred to another position, preferably vegetable cook.  Her physicians supported that request. On April 6, 1994, near the end of the 1993-94 school year, Dr. Timothy Howard wrote: "Gail is not to lift ≥ [more than] 20 lbs at any time due to her chronic illness.  Thank you for your prompt attention to this matter."  (Plaintiff's Exhibit 3 at 6.)   On October 6, 1994, about two months into the beginning of the 1994-95 school year, Dr. Edwin Rice wrote:

> Ms. Ledbetter is a patient of mine who underwent hysterectomy and surgical repair of a dropped bladder 9/15/92. Ms. Ledbetter has done well post operatively. However, I recommend that Ms. Ledbetter not do any lifting in excess of twenty pounds as lifting and straining can break down the surgical repair of this condition.    It is recommended that Ms. Ledbetter be placed in a work assignment that does not involve such lifting or straining.

(Plaintiff's Exhibit 3 at 7.)   Lunchroom manager Jane Holman rejected all such requests, saying "the job she ha[s], she [can] do

7

too," if only Mrs. Ledbetter would quit talking to other employees, watch the garbage canisters more closely, and pull trash bags before they became laden with food scraps.

On October 13, 1994, a confrontation occurred between plaintiff and Jane Holman. Mrs. Ledbetter refused Holman's order to "wipe down the cooler."[10]   She called Carol Wheelock, Child Nutrition Program Coordinator, to complain.   Wheelock drove to Challenger and met with plaintiff and Jane Holman.   Wheelock testified that plaintiff griped of sinus problems, <u>not</u> a violation of her weight restriction.[11]  Wheelock approved the placement of a citation for insubordination in plaintiff's personnel file, and Jane Holman wrote:

> 8:00      Told Gail she needed to wipe down
>           the cooler with bleach water.
>
> app. 8:45 Gail came in to my office, shut the
>           door & told me she had a call in to
>           Ms. Wheelock & she was not going to
>           wipe the coolers down unless she
>           told her to.  That I was harrassing
>           her.  I said no I was'nt, that was
>           her job.  If she didn't that was
>           insurbordanation and I would write

---

[10] There was conflicting testimony regarding whether this job required lifting more than twenty pounds. Peggy Ann Hurst, who formerly worked in the Challenger lunchroom as both meat cook and bread & pastry cook, described two ways to clean the cooler: one was a "quick cleaning" with a bleach water disinfectant; and the other was "a real good job," which required removal of all food items, disassembly of the cooler, deep cleaning of all components, and then reassembly. Dawn Massey Kirby, a cashier in the Challenger lunchroom, testified that a "real good, deep cleaning" of the cooler occurred only at the beginning and end of each school year.

[11] However, the following statement written by plaintiff in the "Employee's Remarks" section of the conference report completed immediately following that meeting contradicts Wheelock's account:

> I spoke with Jane, Mrs. Wheelock, Mr. Kelly, Dr. Gradford about Jane single me out put clean up on me that know one else does. I feel that Jane harest me <u>because of my problem with lifting</u> because I went to Mr. Kelly & Ms. Wheelock.

(Plaintiff's Exhibit 1 at 2 (misspellings in original)(emphasis supplied).)

8

>          her up.  She said fine we'd take it
>          to the Board.

(Plaintiff's Exhibit 13 at 3.)

Plaintiff thereafter complained to Wheelock's supervisor, Paul Kelly.  He ordered Ms. Wheelock to resolve the problem.  Wheelock again met with plaintiff and Jane Holman six days later, on October 19, 1994.  Wheelock testified the three of them prepared a list of duties that did not require lifting more than twenty pounds, and that plaintiff "agreed with" the list, saying "she could do these things."[12]  Plaintiff denied either being shown, or agreeing to such a list.  Whatever the truth may be, this fact is not disputed: plaintiff's duties did not change.

Two weeks later, on November 3, 1994, plaintiff met with principal John Calvarese, Jane Holman, and representatives of the Huntsville Education Association.  Although plaintiff's complaints were aired once again, her job duties still were not changed.  Consequently, on November 7, 1994, she approached the top echelon of the school system hierarchy: she requested a meeting with superintendent Dr. Ron Saunders, but he refused to see her.  She then resigned her position, saying she was tired of being harassed by Jane Holman because of her medical condition.  (Plaintiff's Exhibit 1 at 3.)  This action eventually followed.

Much of the evidence regarding the duties performed by plaintiff following surgery is clouded.  Undoubtedly, that is a reflection of the fact that, for most of the life of this case,

---

[12] Plaintiff's Exhibit 16.  A typewritten version of the handwritten list was introduced as Defendant's Exhibit 5.

plaintiff represented herself *pro se*.   Counsel appeared on her behalf only shortly before trial.   Four facts are clear, however:

- plaintiff's medical restriction never changed;

- the requirement that she pull garbage bags often, if not always, violated the lifting restriction imposed by her physicians;

- Jane Holman, nevertheless, persisted in her insistence that "the job she had she could do too," if only she would quit talking to other employees and pull trash bags before they became heavily laden;[13] and,

- Mrs. Ledbetter unequivocally disliked the kitchen clean-up position.

## II. THE AMERICANS WITH DISABILITIES ACT

Congress passed the Americans with Disabilities Act of 1990 (ADA) for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).   Congress sought "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(8).   To achieve those purposes, the Act commands that

> no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).   The Act imposes an affirmative duty on

---

[13] Jane Holman put feet under her beliefs.   She repeatedly ordered plaintiff to "watch" the garbage cannisters, and to pull trash bags **before** their weight exceeded twenty pounds.   She instructed plaintiff to request assistance from co-workers before lifting anything weighing more than twenty pounds.   And, she posted a sign in the food preparation area advising all employees not to lift more than twenty pounds without assistance.   However, the sign was removed following plaintiff's resignation.

DEC-18-1997  18:05      USDC HUNTSVILLE      205 551 0741  P.011/031

employers to provide reasonable accommodations for disabled individuals. Thus, the term, "discrimination" is defined broadly, to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate: (1) that she has a disability; (2) that she is a "qualified individual" (*i.e.*, that she can perform the essential functions of the job position she holds or seeks, with or without reasonable accommodation being made by the employer[14]); and, (3) that she was discriminated against because of her disability. *See* 42 U.S.C. § 12132; *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996). In addition, a plaintiff must show that the employer had actual or constructive knowledge of her disability. *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996).

Thus, Mrs. Ledbetter bears the burden of proving by a preponderance of the evidence that defendant intentionally discriminated against her because of her disability. That can be done either by direct or circumstantial evidence. When, as here,

---

[14] 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). *See also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

11

the evidence of intent is circumstantial in nature, the Supreme Court has prescribed an analytical process to evaluate the strength of plaintiff's proof. In three decisions rendered over two decades, the Supreme Court "developed a formula for shifting evidentiary burdens between plaintiff and defendant which permits the establishment of intentional discrimination without direct evidence of unlawful motivation." A.C. Modjeska, *Employment Discrimination Law* § 1:09, at 39-40 (3d ed. 1996). The order and allocation of burdens of proof, persuasion, and production were first defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[15] The analytical structure developed by that trilogy has three steps, the ultimate goal of which is that of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 506, 113 S.Ct. at 2746 (quoting *Burdine*, 450 U.S. at 255 n.8, 101 S.Ct. at 1094 n.8). The first

---

[15] Although the Eleventh Circuit has not explicitly held to the following effect, it nevertheless is widely agreed that the burden-shifting analysis expressed in *McDonnell Douglas* and its progeny, and applied in Title VII disparate treatment cases, is similarly followed in deciding cases brought under the ADA. *See* McNemar v. The Disney Store, Inc., 91 F.3d 610, 619 (3d Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 761 n.2 (5th Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); *see also* Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 964 (1997)(implicitly using burden-shifting framework); Johnson v. Boardman Petroleum, Inc. 923 F. Supp. 1563 (S.D. Ga. 1996); Lewis v. Zilog, Inc., 908 F. Supp. 931 (N.D. Ga. 1995).

step is satisfied when the plaintiff establishes a *prima facie* case.  At the second stage of analysis, the burden of production shifts to defendant to rebut the presumption of intentional discrimination thus raised by a *prima facie* case, by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.  If defendant does so, then in the final step of the inquiry plaintiff must show by a preponderance of the evidence that defendant's stated reasons are mere pretexts for unlawful, discriminatory motives. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

**A.   The Prima Facie Case**

**1.   Is plaintiff "disabled"?**

The ADA defines the concept of "disability" in a manner that includes any individual:

(A)   who has a *physical or mental impairment* that *substantially limits* one or more of the *major life activities* of such individual, or

(B)   who has a *record of* such an impairment, or

(C)   who is *regarded as having* such an impairment.

*See* 42 U.S.C. § 12102(2).  When applying that definition, three questions must be asked: (1) *is the condition an "impairment"?*; (2) *does the impairment "substantially limit" a major life activity?*; and (3) *what qualifies as a "major life activity"?*

**a.   Is plaintiff's condition an "impairment"?**

The ADA does not define those conditions constituting a "physical or mental impairment."  Instead, that phrase, and many

13

other significant terms in the Act, are only defined in regulations promulgated by the Equal Employment Opportunity Commission[16] pursuant to authority delegated by Congress,[17] and, in the "Interpretive Guidance on Title I of the Americans With Disabilities Act" attached as an appendix to those regulations. Those regulations are not binding on this court. Nevertheless, "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ... for guidance" when interpreting the ADA. *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 911 (11th Cir. 1996). Moreover, the Supreme Court has long recognized that an agency's interpretation of a statute it is charged with enforcing should be given "considerable weight," and should not be disturbed unless it appears from the statute or legislative history that Congress intended a different construction.

> [When] Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Griggs v. Duke Power Co.,* 401 U.S. 424, 433, 434, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971)(administrative interpretations "entitled to great deference"). The *Chevron* standard is applied by

---

[16] *See* 29 C.F.R. § 1630.

[17] *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA).

14

the Eleventh Circuit in the context of ADA claims. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996).

The EEOC's administrative interpretations of the ADA define a "physical impairment" as including:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or ....

29 C.F.R. § 1630.2(h)(1)(emphasis supplied). Applying that definition to the facts, there can be little doubt that plaintiff suffers from a physical impairment. Indeed, defendant does not directly contest this issue. Mrs. Ledbetter underwent surgical repair of a dropped bladder on September 15, 1992. As a result, she is unable to "do any lifting in excess of twenty pounds as lifting and straining can break down the surgical repair of this condition,"[18] or cause her to lose control of her bladder functions. The condition is permanent, and it affects her genito-urinary system.

### b. Does plaintiff's impairment "substantially limit" a "major life activity"?

"A physical impairment, standing alone, however, is not necessarily a disability as contemplated by the ADA. ... The ADA requires that the impairment substantially limit one or more of the individual's major life activities." *Gordon*, 100 F.3d at 911

---

[18] Plaintiff's Exhibit 3 at 7.

15

(citations omitted)(emphasis supplied).[19]

The EEOC includes both "working" and "lifting" among its lists
of those functions constituting "major life activities."   For
example, 29 C.F.R. § 1630.2(i) provides that:

> (i) *Major Life Activities* means functions such as
> caring for oneself, performing manual tasks, walking,
> seeing, hearing, speaking, breathing, learning, and
> working. [Emphasis supplied.]

Further, the Interpretative Guidance attached as an Appendix to
that section elaborates as follows:

### Section 1630.2(i)   Major Life Activities

> This term adopts the definition of the term "major
> life activities" found in the regulations implementing
> section 504 of the Rehabilitation Act at 34 CFR part 104.
> "Major life activities" are those basic activities that
> the average person in the general population can perform
> with little or no difficulty.   Major life activities
> include caring for oneself, performing manual tasks,
> walking, seeing, hearing, speaking, breathing, learning,
> and working. This list is not exhaustive. For example,
> other major life activities include, but are not limited
> to, sitting, standing, lifting, reaching.   ...

29  C.F.R.  Pt.  1630,  App.  §  1630.2(i),  at  402  (citations

---

[19] *See also* I B. Lindemann & P. Grossman, *Employment Discrimination Law* 276
(3d ed. 1996):
> The definitions of "major life activity" and "substantial
> limitation" are closely allied.   "Major life activities" are the
> basic activities that average persons can perform with little or no
> difficulty, "such as caring for oneself, performing manual tasks,
> walking, seeing, hearing, speaking, breathing, learning, and
> working."  "Substantially limits" means either the total inability
> or a severe restriction on the ability to perform a major life
> activity (in terms of condition, manner, or duration) as compared to
> the general population.   The determination of whether an individual
> is "disabled" [therefore] depends on the effect the impairment has
> on the particular individual's life, and not simply on the name or
> diagnosis of the impairment. [*Quoting* 29 C.F.R. §§ 1630.2(i),
> 1630.2(j)(1).]

16

omitted)(emphasis supplied).[20]

The more difficult question is whether plaintiff's impairment substantially limits the major life activities of lifting or working. That phrase, "substantially limits," also is not defined by the ADA, but implementing regulations instruct that it means the plaintiff either is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The EEOC further instructs that the following factors should be considered in determining whether a particular individual is substantially limited in a major life activity:

> (i) The nature and severity of the impairment;

> (ii) The duration or expected duration of the impairment; and

> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

Wanda Gail Ledbetter's treating physicians never deviated from

---

[20] See also Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996) (holding that lifting is a major life activity and that inability to lift more than 15 pounds creates genuine issue of material fact as to whether impairment substantially limits the ability to lift); Cordle v. Tropicana Products, Inc., 1997 WL 118433, No. 94-1835-CIV-T-17A (M.D. Fla. Feb. 20, 1997) (citing the regulations as supporting plaintiff's claim that a lifting restriction limited the major life activity of performing manual tasks); Haysman v. Food Lion, Inc., 893 F. Supp. 1092, 1100 (S.D. Ga. 1995) (citing the EEOC regulations).

17

the restriction they imposed on her activities. Even so, she is not barred from all lifting: only lifting more than twenty pounds. Thus, the relevant inquiry is whether plaintiff, as compared to the average person in the general population, is "significantly restricted as to the condition, manner, or duration" under which she can perform the functions of lifting and working. 29 C.F.R. § 1630.2(j).

Several circuits outside the Eleventh have considered the question whether a restriction, such as that imposed on Mrs. Ledbetter, constitutes a substantial limitation on a person's ability to lift or to work. The courts considering this question have universally held that such a restriction does not constitute a disability as defined by the ADA and its regulatory gloss.

The Fourth Circuit, for example, considered the issue in *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346 (4th Cir. 1996). There, plaintiff was assigned a twenty-five pound lifting restriction. The Fourth Circuit concluded as a matter of law that such a restriction did not constitute a substantial limitation on a person's ability to lift, work, or perform any other major life activity. *Id.* at 349.

The Fifth Circuit reached the same conclusion in *Ray v. Glidden Co.*, 85 F.3d 227 (5th Cir. 1996). At issue there was a restriction that limited the plaintiff to lifting only five to ten pounds, a far greater constraint than the twenty pound bar imposed on Mrs. Ledbetter. The court noted that, when considering a major life activity other than working, its focus must be whether the

18

person can perform the normal activities of daily living. The court concluded that plaintiff had presented only an inability to perform the "discrete task" of lifting, and that such handicap did not render him substantially limited in a major life activity.

In *McKay v. Toyota Motor Manufacturing, U.S.A. Inc.*, 110 F.3d 369 (6th Cir. 1997), the Sixth Circuit considered a plaintiff with carpal tunnel syndrome. She was restricted to lifting weights of twenty pounds or less, was to avoid using vibrating tools, and was also to avoid repetitive use of her right hand. The court concluded that, although the plaintiff unquestionably suffered an impairment, it did not substantially limit her ability to work or to lift and therefore did not constitute a disability under the ADA.

The Eighth Circuit considered lifting restrictions in three cases. In *Wooten v. Farmland Foods*, 58 F.3d 382 (8th Cir. 1995), the plaintiff's restrictions included no working with meat products, no working in a cold environment, lifting ten pounds frequently with a twenty pound maximum. In *Aucutt v. Six Flags Over Mid-American, Inc.*, 85 F.3d 1311 (8th Cir. 1996), the plaintiff faced a twenty-five pound restriction. Finally, in *Helfter v. United Parcel Services, Inc.*, 115 F.3d 613 (8th Cir. 1997), plaintiff was restricted to lifting no more than ten pounds frequently and twenty pounds occasionally, and she also was to avoid sustained, highly repetitive activities using either hand. In all three cases, the Eighth Circuit concluded that the lifting restrictions did not constitute a disability.

19

The Ninth Circuit most recently considered lifting restrictions in *Thompson v. Holy Family Hospital*, 121 F.3d 537 (9th Cir. 1997). There, plaintiff was restricted from lifting more than 25 pounds on a continuous basis, more than 50 pounds twice a day, and more than 100 pounds once a day. Finding itself in "territory well-charted by our colleagues in other circuits," the Ninth Circuit concluded that plaintiff's restrictions were not substantially limiting and affirmed summary judgment for the defendant.

It is significant to note that the courts in the foregoing cases considered the impact of a lifting restriction on the major life activities of lifting and working.

With particular reference to the facts of this case, Mrs. Ledbetter produced no credible evidence of an inability to perform the normal, basic activities of daily living, or of an inability to care for herself. She did testify of limitations on certain recreational activities, but conceded they were not the result of her lifting restriction.

Equally significant is the fact that Mrs. Ledbetter produced no evidence that her impairment or resulting lifting restriction significantly limited her ability to perform either an entire class of jobs, or a broad range of jobs in various classes, as compared to the average person having comparable training, skills, and

**20**

abilities. *See* 29 C.F.R. § 1630.2(j)(3)(i).[21]  She did testify that she no longer could perform the duties that had been imposed upon her by Jane Holman, and further testified that she attempted to perform virtually the same duties at two other food establishments, but was unable to do so.  At most, however, she has suggested the inability to perform a single, particular job.[22]  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. §

_____

[21] According to the EEOC, an individual is substantially limited in the major life activity of "working" if she or he is significantly restricted in the ability to perform either an entire class of jobs, or a broad range of jobs in various classes, as compared to the average person. 29 C.F.R. § 1630.2(j)(3)(i). The following factors (along with those listed in *id.* § 1630.2(j)) should be considered in regard to such a claimed limitation:

   (A)  The geographical area to which the individual has reasonable access;
   (B)  The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
   (C)  The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii); *see also Gordon*, 100 F.3d at 911-12 (quoting regulations).

[22] Moreover, plaintiff presented no evidence establishing how many food service jobs are available in the relevant geographic area, nor any objective information indicating the amount of lifting required in those positions.  Such testimony is explicitly called for in the Interpretative Guidance provided by the EEOC:

   The terms "numbers and types of jobs" and "number and types of other jobs" ... require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (*e.g.*, "few," "many," "most") from which an individual would be excluded because of an impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(j), at 403 (emphasis added).  Those terms are "not intended to require an onerous evidentiary showing." *Id.*  Nevertheless, by failing to present any comparative employment data, plaintiff has not met even this slight burden.

21

1630.2(j)(3)(i).

For example, in *Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir. 1994), *cert. denied*, 513 U.S. 1152, 115 S.Ct. 1104 (1995), the Tenth Circuit considered the case of an employee whose employer refused to rehire him following a medical leave of absence, because the employee's doctor concluded that he would not be able to perform the duties of his old job. Despite evidence that the plaintiff was limited in the abilities to stand, walk, or lift objects over his head, the court held that he was **not** significantly restricted in his ability to perform a broad range of jobs in various classes:

> [The] evidence [of plaintiff's impairments] ... does little to show that Bolton is restricted from performing a class of jobs. The evidence does not address Bolton's vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which Bolton would also be disqualified. Instead, the evidence goes to the nature and severity, duration, and impact of Bolton's impairment—the factors listed in 29 C.F.R. § 1630.2(j)(2). Because Bolton failed to produce evidence showing a significant restriction in his "ability to perform either a class of jobs or a broad range of jobs in various classes," *id.* § 1630.2(j)(3)(i), we affirm the award of summary judgment to Scrivner on Bolton's ADA claim.

*Bolton*, 36 F.3d at 944 (footnote omitted).

In view of the persuasive precedent discussed above, and, the deficiencies in plaintiff's proof, this court concludes that Mrs. Ledbetter's twenty pound lifting restriction does not significantly limit her ability to perform the major life activities of lifting or working. The court accordingly holds that she has failed to meet the threshold requirement of an ADA claim premised upon 42

U.S.C. § 12102(2)(A).

## 2.   Does plaintiff have "a record of" disability?

Even so, § 12102(2)(B) of the ADA defines an individual who "has a record of" a physical impairment that substantially limits one or more of such person's major life activities as "disabled." Plaintiff asserts such a claim in brief, but this court finds no evidence to support it. It therefore is rejected.

## 3.   Was plaintiff "regarded as" disabled?

Finally, if an individual cannot satisfy either the first part of the ADA's definition of "disability," or the second, "record of" portion, she still may be able to satisfy the third prong of the definition, providing that a person who is "regarded" by an employer "as having such an impairment" — *i.e.*, one that substantially limits a major life activity — is an individual with a disability. 42 U.S.C. § 12102(2)(C).   The EEOC Interpretive Guidance lists three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

> (1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;
>
> (2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or
>
> (3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(l), at 404.

It is clear from the evidence presented that Shirley Gore,

23

Jane Holman, and others perceived plaintiff as being indolent, disinterested, or insubordinate, but no evidence establishes that she was regarded as substantially limited in any way. Plaintiff's difficulties at Challenger were not the result of an opinion that she was disabled. Quite the contrary. Jane Holman believed plaintiff was claiming a disability she did not have. Accordingly, plaintiff is unable to establish a *prima facie* case on the basis of 42 U.S.C. § 12102(2)(C).

Because plaintiff has failed to prove a *prima facie* case of discrimination on the basis of any part of the ADA's definition of "disability," the court need not address defendant's claimed legitimate, non-discriminatory reasons for its treatment of Mrs. Ledbetter at this juncture.

### III. RETALIATION

The ADA also provides protection from retaliation for individuals who seek accommodation for a disability.

**(a) Retaliation**
No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). That provision is similar to Title VII's prohibition against retaliation.[23] Accordingly, ADA retaliation

_____

[23] 42 U.S.C. § 2000e-3(a) provides in part:

**(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an

24

claims are analyzed under the same framework employed for retalia-

tion claims arising under Title VII. *Stewart v. Happy Herman's*

*Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)(citing

*McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068,.1075-77 (11th Cir.

1996)(applying Title VII jurisprudence to interpret meaning of ADA

provisions on retaliation), *cert. denied*, ___ U.S. ___, 117 S.Ct.

1819, 137 L.Ed.2d 1028 (1997)).

## A.   Prima Facie Case

Just as with a Title VII discriminatory treatment claim, a

plaintiff alleging an ADA retaliation claim must begin by estab-

lishing a *prima facie* case.

> To establish a *prima facie* case of retaliation [under the
> ADA], a plaintiff must show: (1) statutorily protected
> expression; (2) adverse employment action; and (3) a
> causal link between the protected expression and the
> adverse action. ... Once a *prima facie* case is estab-
> lished, the burden then shifts to the defendant employer
> to come forward with legitimate non-discriminatory
> reasons for its actions that negate the inference of
> retaliation. ... The plaintiff must then demonstrate ...
> that the employer's proffered non-discriminatory reasons
> are a pretextual ruse designed to mask retaliation. ...

*Stewart*, 117 F.3d at 1287 (citing *Goldsmith v. City of Atmore*, 996

F.2d 1155, 1163 (11th Cir. 1993)(explaining requirements to show

retaliation in Title VII context)).

### 1.   First element of prima facie case: *statutorily protected expression*

It is undisputed that Mrs. Ledbetter complained to Jane Holman

(and, when that proved futile, to officials in the school system

hierarchy above Holman) of being required to perform work that

---

investigation, proceeding, or hearing under this subchapter.

exceeded her medically-prescribed lifting restriction.  In view of
this court's determination that plaintiff failed to prove that she
is "disabled," however, the problematic question is: *did such
complaints amount to statutorily protected expression?*  Neither
plaintiff nor defendant meaningfully address that issue in their
proposed findings of fact and conclusions of law.

The meager law on the subject tends to support this conclu-
sion: *a plaintiff is not required to establish that she is a
"qualified individual with a disability" as part of a prima facie
showing of retaliation under the ADA.*  By its own terms, the ADA
retaliation provision protects "any individual" who has opposed any
act or practice made unlawful by the ADA, or who has made a charge
of discrimination on the basis of disability. 42 U.S.C. § 12203(a).
Thus, "[a]n individual who is adjudged not to be a 'qualified
individual with a disability' may still pursue a retaliation claim
under the ADA." *Krouse v. American Sterilizer Co.*, 126 F.3d 494,
502 (3rd Cir. 1997).  To similar effect is *Tipton v. Canadian
Imperial Bank of Commerce*, 872 F.2d 1491 (11th Cir. 1989), holding
that a plaintiff "need not prove the underlying claim of discrimi-
nation which led her to protest"; rather, "an employee's opposition
to discrimination is protected if she could reasonably form a good
faith belief that the discrimination in fact existed." *Tipton,* 872
F.2d at 1494; *see also Rollins v. State of Florida Department of
Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)(holding that a
plaintiff can establish a prima facie case of retaliation under the

26

opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices). The Seventh Circuit has reached a similar conclusion in the Title VII context. *See, e.g.*, *Jennings v. Tinley Park Community*, 796 F.2d 962, 967 (7th Cir. 1986)(holding that plaintiff must make retaliation claim in good faith and with a reasonable and sincere belief that he or she is opposing unlawful discrimination), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987); *Rucker v. Higher Education Aids Board*, 669 F.2d 1179, 1182 (7th Cir. 1982)("it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case"). The court concludes that Mrs. Ledbetter subjectively believed that the school system was engaging in employment practices made unlawful by the ADA, and that such a belief was objectively reasonable.[24]

### 2. Second element of prima facie case: an adverse employment action

This court is satisfied that Mrs. Ledbetter suffered adverse employment action, <u>after</u> she took her complaints to officials above

---

[24] *Cf.* Little v. United Technologies, 103 F.3d 956, 960 (11th Cir. 1997), holding in connection with a Title VII retaliation claim:

> We previously have recognized that a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. ... It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record also must indicate that the belief, though perhaps mistaken, was objectively reasonable. [Citation omitted; emphasis in original.]

27

the level of cafeteria manager. Her work load increased. Holman
added menial tasks that previously had been rotated among all
employees to plaintiff's daily duties.[25]  Plaintiff presented proof
that, following her complaints to Holman's superiors, her
activities were subjected to closer scrutiny and criticism, she was
reprimanded for requesting assistance from co-workers, and co-
workers in turn were reprimanded for attempting to help her.[26]  Cf.
*Tanner v. California Physicians' Service*, 1978 WL 210, *4 (N.D.
Cal. 1978)(employer created an atmosphere of hostility among co-
workers that impeded plaintiff's performance of duties); *EEOC v.
Union Bank of Arizona*, 1976 WL 1727, *1 (D. Ariz. 1976)(employer
incitement of co-employee hostility).  One particularly revealing
incident occurred when Connie Sue Bennett helped plaintiff load
garbage into a dumpster.  The two women tried repeatedly to lift a
particularly full, trash-laden bag from its canister, but suction
kept pulling it back down.  After several, unsuccessful attempts to
extricate the bag, Bennett and Ledbetter "got tickled" and began
laughing.  Holman heard them and angrily tongue-lashed both women
for loafing.  Holman later told Bennett to disregard the incident,
because her invective was directed only at plaintiff.[27]

Holman also never considered plaintiff for vacancies in less

---

[25] For example, being required to "wipe down the cooler" or wash windows
in the manager's office — sometimes more than once in the same week.

[26] Connie Sue Bennett testified that, "a bunch of times," Holman scolded
other employees for helping plaintiff (e.g., "That's Gail's job. Ya'll need to
let her do it"), but "mostly" Holman got onto plaintiff for requesting
assistance. When plaintiff complained, Holman retorted: "Learn to like it.
That's the way it's gonna be."

[27] That testimony is confirmed by a note of the incident Holman placed in
plaintiff's personnel folder. (Plaintiff's Exhibit 13 at 8.)

28

strenuous positions.[28]  This court recognizes, of course, that in the absence of proof of a disability, defendant had no duty to accommodate plaintiff's impairment by reassigning her to a vacant position.    Nevertheless, defendant did have a duty to avoid treating plaintiff more harshly than others, because she complained about being required to perform duties that exceeded her medical restriction.  Yet, that is precisely what happened after Ledbetter took her complaints above Holman's head.  Defendant's own witnesses testified that most of the food service workers were "floaters," whose duties changed daily or weekly.  The afternoon duties of all workers changed daily or weekly, at the manager's discretion. Within that fluid framework of floating job assignments, plaintiff frequently, if not invariably, was assigned the least desirable tasks following her complaints to officials higher in the school system hierarchy.

### 3.  Third element of prima facie case: *causal relation between adverse action and protected activity*

Plaintiff's burden with regard to the element of causation is slight: she is required to show only "that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).    Here, there was a direct relationship between plaintiff's complaints to school system officials outside the cafeteria, and, those actions plaintiff described as "harassment."

---

[28] Three new employees were hired as Child Nutrition Program workers at Challenger between October, 1992 and November, 1994. (Plaintiff's Exhibit 4.) Each was given a position as cashier or cook.  Holman did not consider moving plaintiff into any of those positions.

Although Mrs. Ledbetter complained to Jane Holman throughout the time she held the clean-up position, she did not take her grievances to Holman's superiors until 1994. That step triggered a change in Holman's treatment of her. The shift is reflected in Holman's increased vigilance of plaintiff's work habits, closer documentation of her infractions, and more frequent assignment of menial tasks. Records maintained by Holman support this finding. Plaintiff's personnel folder contains seven notes written by Holman, Jan Waller, and Verna Twing, each recording an occasion on which plaintiff was perceived to be avoiding work by standing around, talking with someone, or taking an early break. (Plaintiff's Exhibit 13.) The first of those notes is dated April 8, 1994. There are no similar notes prior to that date.

## A. The Second Stage: *defendant's explanation for the contested employment actions*

Once the plaintiff makes out a *prima facie* case of retaliation, the defendant then has the burden of producing evidence that it had a nonretaliatory reason for its action. The school system notes that all duties performed by plaintiff previously had been the sole responsibility of Cheryl Hill, who held the clean-up position until she resigned. It logically follows, therefore, that the person who assumed Hill's job would be assigned the same duties.[29]

Plaintiff asserts in a post-trial pleading that "defendant's articulated non-discriminatory reason was never established at trial and the plaintiff is therefore not required to rebut any

---

[29] *See* defendant's proposed findings at 13.

30

evidence." (Plaintiff's Proposed Findings of Fact and Conclusions of Law at 17.)  She is mistaken.  The court finds that defendant produced evidence of legitimate, non-discriminatory reasons for assigning certain tasks to plaintiff.  This court is satisfied that Shirley Gore — not Jane Holman — assigned the clean-up position to Mrs. Ledbetter upon Cheryl Hill's resignation and prior to plaintiff's surgery.[30]  Thus, the duties associated with that position — removing trash from canisters in the student dining area, wiping student lunch tables, and cleaning the kitchen and staff bathrooms — were not assigned to plaintiff in retaliation for her complaints, which began after that job assignment.  This evidence is sufficient to defeat the inference of retaliation raised by plaintiff's *prima facie* case as to those employment actions.  Absent evidence of pretext from the plaintiff, the court must find in favor of defendant on those aspects of plaintiff's retaliation claim.

Even so, the court finds that other tasks — such as wiping down the cooler and washing Holman's office windows — were not the exclusive responsibility of the person who occupied the clean-up position prior to plaintiff.   Testimony of other Challenger employees established that those tasks formerly had been rotated among all employees.  Yet, following her complaints to higher-ups, plaintiff more often than not was assigned those jobs.  Defendant does not articulate reasons to explain those actions.  In fact, Holman admitted that, since plaintiff's resignation, those tasks

---

[30] See text accompanying note 3 on page 4, and, page 6 *supra*.

CONTINUE FROM PREVIOUS PAGE   001

evidence." (Plaintiff's Proposed Findings of Fact and Conclusions of Law at 17.) She is mistaken. The court finds that defendant produced evidence of legitimate, non-discriminatory reasons for assigning certain tasks to plaintiff. This court is satisfied that Shirley Gore — not Jane Holman — assigned the clean-up position to Mrs. Ledbetter upon Cheryl Hill's resignation and prior to plaintiff's surgery.[30]   Thus, the duties associated with that position — removing trash from canisters in the student dining area, wiping student lunch tables, and cleaning the kitchen and staff bathrooms — were not assigned to plaintiff in retaliation for her complaints, which began after that job assignment. This evidence is sufficient to defeat the inference of retaliation raised by plaintiff's *prima facie* case as to those employment actions. Absent evidence of pretext from the plaintiff, the court must find in favor of defendant on those aspects of plaintiff's retaliation claim.

Even so, the court finds that other tasks — such as wiping down the cooler and washing Holman's office windows — were not the exclusive responsibility of the person who occupied the clean-up position prior to plaintiff.   Testimony of other Challenger employees established that those tasks formerly had been rotated among all employees. Yet, following her complaints to higher-ups, plaintiff more often than not was assigned those jobs. Defendant does not articulate reasons to explain those actions.   In fact, Holman admitted that, since plaintiff's resignation, those tasks

---

[30] See text accompanying note 3 on page 4, and, page 6 *supra*.

31

are again being rotated among all employees.[31]

In addition, plaintiff has produced evidence that Holman subjected her to closer scrutiny and criticism, and began reprimanding those who attempted to help her, after plaintiff took her complaints to Holman's superiors.

In the absence of evidence establishing a legitimate reason for those actions, the court finds in favor of plaintiff on her retaliation claim, insofar as it relates to the assignment of those additional tasks, surveillance, and reprimands discussed above.

### IV. DAMAGES

Plaintiff seeks reinstatement, compensatory and punitive damages, and an award of attorney's fees. Title I of the ADA provides that Title VII remedies are available to persons proving discrimination on the basis of disability. 42 U.S.C. § 12117(a). Remedies available under Title VII of the Civil Rights Act of 1964 may include retroactive relief, back pay, and injunctions. 42 U.S.C. § 2000e-5(g). The Civil Rights Act of 1991 expanded the right of recovery for victims of intentional discrimination to include compensatory and punitive damages. 42 U.S.C. § 1981a(a)(2). Attorney's fees also may be awarded. Thus, successful ADA plaintiffs are entitled to "make whole" relief. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)(holding that a Title VII plaintiff is entitled to be made whole for injuries suffered on account of unlawful

---

[31] Holman stated that she now rotates those jobs because they are the most sought after duties in the lunchroom. The court finds her testimony unconvincing. If that were true, Holman would have had no reason to ignore plaintiff's repeated requests to be relieved of those duties.

32

employment discrimination).   Similarly, the EEOC's Technical
Assistance Manual states:

> The "relief" or remedies available for employment
> discrimination ... may include hiring, reinstatement,
> promotion, back pay, front pay, reasonable accommodation,
> or other actions that will make an individual "whole" (in
> the condition s/he[32] would have been but for the
> discrimination).

EEOC, *A Technical Assistance Manual on the Employment Provisions
(Title I) of the ADA* § 10.5, at X-8 (1992). *See also EEOC v. AIC
Security Investigations Ltd.,* 55 F.3d 1276, 1286 (7th Cir. 1995)
(upholding award of $50,000 in compensatory damages to successful
ADA plaintiff); *Dutton v. Johnston County Board of Commissioners,*
868 F. Supp. 1260 (D. Kan. 1994) (granting successful ADA
plaintiff's request for backpay and reinstatement).   Punitive
damages are available upon a showing that the employer acted "with
malice or with reckless indifference to the federally protected
rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(3).   *See
AIC Security Investigations,* 55 F.3d at 1287 (upholding award of
$150,000 in punitive damages for unlawful termination based on
plaintiff's disability); *Sharp v. Abate,* 887 F. Supp. 695 (S.D.N.Y.
1995) (recognizing availability of punitive damages under the ADA);
*Haltek v. Village of Forest Park,* 864 F. Supp. 802 (N.D. Ill. 1994)
(recognizing availability of punitive damages for retaliatory
employment practices under the ADA).

## A.   Back pay and other employment benefits

Plaintiff seeks recovery of back pay, life and health

---

[32] This offensive contraction of "she or he" is in the original text.

insurance coverage, sick days, and retirement benefits for the period beginning with the date of her resignation and continuing to the present. "[T]he purpose of back pay awards is to make whole the victims of employment discrimination." *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1167 (5th Cir. 1980)(citing *Pettway v. American Cast Iron Pipe. Co.*, 494 F.2d 211, 252 (5th Cir. 1974), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)).

Such awards are not appropriate in every case, however. In *Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir. 1990), the Fifth Circuit stated that a plaintiff is entitled to an award of back pay only if the plaintiff was actually or constructively discharged by the employer. *Accord Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986)(remedy of back pay appropriate only where plaintiff was constructively discharged); *Satterwhite v. Smith*, 744 F.2d 1380, 1381 n.1 (9th Cir. 1984); *Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192, 197 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979); *see also* I B. Lindemann & P. Grossman, *Employment Discrimination Law* 838 (3d ed. 1996)("An employee who quits is not entitled to 'post-quit' economic damages").

Consequently, Mrs. Ledbetter is entitled to recover wages accruing after November 7, 1994, only if her resignation on that date is treated as a constructive discharge, or forced resignation.

Mrs. Ledbetter claims that she was forced to resign because of Jane Holman's harassment. To prove that claim, Mrs. Ledbetter must

34

prove that her "working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991)(quoting *Wardwell v. School Board of Palm Beach County, Florida*, 786 F.2d 1554, 1557 (11th Cir. 1986)(quotation marks omitted)). A constructive discharge is deemed to have occurred only where the court finds "a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'" *Hill*, 934 F.2d at 1527 (quoting *Wardwell*, 786 F.2d at 1558)).

The retaliatory harassment endured by Mrs. Ledbetter at Challenger took three forms: more frequent assignment of certain unpleasant tasks (*e.g.*, washing windows, wiping down the cooler); increased surveillance and scrutiny; and reprimands of co-workers who assisted plaintiff in the performance of duties. That conduct, while no doubt unpleasant and perhaps embarrassing to Mrs. Ledbetter, did not approach the level of "intolerable." *See, e.g., Hill*, 934 F.2d at 1527 (holding that a written reprimand, increased criticism by supervisors, and withdrawal of support "did not create intolerable working conditions that would compel a reasonable person to resign"); *accord Boze v. Branstetter*, 912 F.2d 801, 804-06 (5th Cir. 1990)(unwarranted criticism, probation, poor performance evaluation and withdrawal of responsibilities not constructive discharge as a matter of law); *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993)(undue criticism

35

and a poor performance evaluation not sufficient for constructive discharge); *Dudley v. Wal-Mart Stores, Inc.*, 931 F. Supp. 773, 808 (M.D. Ala. 1996)("excessive and unwarranted criticism is not the type of conduct that would make working conditions so intolerable that a reasonable person would feel compelled to resign").

In the opinion of this court, a reasonable person, faced with Holman's conduct, would not feel compelled to resign. A reasonable person would have remained in her position, filed an EEOC claim, and pursued this lawsuit without resigning her position at Challenger. Mrs. Ledbetter could have done so. That she chose to resign rather than endure does not entitle her to recover for the wages she lost as a result of her choice.

## B. Reinstatement

A prevailing plaintiff in a retaliation case generally is entitled to reinstatement. *See, e.g., McClure v. Mexia Independent School District*, 750 F.2d 396, 398 (5th Cir. 1985). As with back pay awards, however, courts do not order a plaintiff reinstated unless her voluntary resignation is deemed to rise to the level of a constructive discharge. *See Maney v. Brinkley Municipal Waterworks & Sewer Department*, 802 F.2d 1073, 1075 (8th Cir. 1986)("As a general rule, employees are entitled to awards such as ... reinstatement only if they were actually or constructively discharged from their employment"); *see also Major v. Rosenberg,* 877 F.2d 694, 695 (8th Cir. 1989); *Derr,* 796 F.2d at 342("reinstatement [is] not available to [plaintiff] unless she was

36

constructively discharged"); *Bimbo v. Burdette Tomlin Memorial Hospital*, 1986 WL 15319, *5 (D.N.J. 1986)(citing *Fancher v. Nimmo*, 549 F. Supp. 1324, 1333 (E.D. Ark. 1982)). Indeed, a close reading of Title VII itself suggests such relief is not always proper: "No order of the court shall require ... the ... reinstatement ... of an individual as an employee ... if such individual ... was suspended or discharged for any reasons other than discrimination." 42 U.S.C. § 2000e-5(g)(2)(A); *see also* II B. Lindemann & P. Grossman, *Employment Discrimination Law* 1743 (3d ed. 1996)(noting limits to injunctive relief suggested by the language of Title VII).

Accordingly, because the court has determined that Mrs. Ledbetter's voluntary resignation was not a constructive discharge, reinstatement is not an appropriate remedy in this case.

## C.   Emotional distress

Mrs. Ledbetter nevertheless may recover for non-economic losses suffered as a result of defendant's retaliation. Such losses could include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). The only evidence on this issue was plaintiff's testimony that Holman's harassment caused her to become "reclusive." Mrs. Ledbetter stated that it was "hard to work" because she feared her co-workers "would be retaliated against" if they helped her or talked to her. Holman's harassment effectively drove a wedge between Ledbetter and other cafeteria employees at Challenger.

37

Those who continued to talk to, and assist Mrs. Ledbetter were subjected to reprimands. Others were enlisted as "snoops," in an effort to catch Mrs. Ledbetter loafing. Mrs. Ledbetter was publicly reprimanded and humiliated for seeking help with heavy lifting, and was repeatedly given the dirtiest, most unpleasant tasks in the lunchroom. The emotional pain, suffering, mental anguish, and loss of enjoyment of life resulting from that treatment is compensable. The court finds that plaintiff is entitled to damages in the amount of $6,000.00 for emotional distress and mental anguish resulting from the retaliatory conduct of her supervisor. The amount awarded is tempered by the fact that Mrs. Ledbetter's own conduct contributed to the creation and enhancement of the opinion held by Jane Holman that plaintiff was indolent and insubordinate. (See, e.g., the observations of co-workers summarized on pages 4-5 supra.)

## D.  Punitive Damages

Under the ADA, a plaintiff may recover punitive damages by showing that defendant (1) engaged in intentional discrimination, and (2) did it "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "Malice" means "an intent to harm" and "recklessness" means "serious disregard for the consequences of [one's] actions." Splunge v. Shoney's, Inc., 97 F.3d 488, 491 (11th Cir. 1996)(citation omitted)(internal quotation marks omitted). The evidence in this case showed that the only acts which could plausibly be deemed "malicious" or "reckless" were

38

solely acts of Jane Holman. She is not part of the Huntsville City School System's higher management. Such evidence is insufficient to hold the school system liable for punitive damages. *Reynolds v. CSX Transportation, Inc.*, 115 F.3d 860, 869 (11th Cir. 1997) (citing *Splunge*, 97 F.3d at 491-92 (holding that an employer will not be liable for punitive damages merely because a supervisor who is not part of "higher management" acted with the requisite "malice" or "reckless indifference")).

Moreover, even if this court determined that Holman's actions were "malicious," and imputed those acts to the school system, punitive damages in such a case may not be recovered against "a government, government agency or political subdivision." 42 U.S.C. 1981a(b)(1); *see also Beasley v. St. Tammany Parish School Board,* NO. CIV.A. 96-2333, 1997 WL 382056, at *4 (E.D. La., July 9, 1997)(relying on § 1981a(b)(1) to deny punitive damages in Title VII action against school board); *Fussell v. Georgia Ports Authority*, 906 F. Supp. 1561 (S.D. Ga. 1995)(holding that a governmental entity cannot be held liable for punitive damages in an action under the ADA). Accordingly, punitive damages are not appropriate in this case.

## D.   Attorney's fees

Attorney's fees are justified. If the parties cannot agree as to what amount would be reasonable compensation for those attorneys who assisted plaintiff in the final preparation of her claims and at trial, then plaintiff's counsel are directed to submit a fee request and supporting documentation to the court within 21 days;

39

defendant may file a response within 14 days; and, plaintiff may reply, if she chooses, within 7 days.

### V. CONCLUSION

A judgment consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _18th_ day of December, 1997.

_____
United States District Judge

**40**